## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

    v.

ELVIS CHAN, in his official capacity as
Assistant Special Agent of the Federal
Bureau of Investigation,

450 Golden Gate Ave.
San Francisco, CA 94102,

               *Defendant*.

Case No. 1:24-cv-344

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Committee on the Judiciary of the United States House of Representatives (Judiciary Committee or Committee) brings this civil action against Defendant Elvis Chan to enforce a duly authorized, issued, and served Congressional subpoena to Chan (Subpoena[1]), attached as Exhibit A. The Bipartisan Legal Advisory Group (BLAG), on behalf of the United States House of Representatives (House), has expressly authorized this lawsuit. The Judiciary Committee alleges as follows:

---

[1] The Committee issued two subpoenas to Chan. The only difference was the return date. To avoid any confusion, Subpoena refers to both subpoenas.

## INTRODUCTION

1.      After public reporting revealed that the Executive Branch was coercing and colluding with technology companies and other intermediaries to censor online speech, the Judiciary Committee launched an investigation into how and to what extent agencies like the Federal Bureau of Investigation (FBI) were working to interfere with the marketplace of ideas and suppress the voices of the American people.  The ultimate purpose of this investigation is to develop legislative reforms, such as new statutory limits on the Executive Branch's ability to work with social media companies and other entities to restrict the circulation of content online and deplatform users.  And to do so, the Committee must first fully understand the nature of the problem.

2.      The Committee quickly identified Chan as a pivotal figure in its investigation. Publicly available information indicated, and information uncovered during the Committee's investigation to date has confirmed, that Chan was at the heart of the FBI's interactions with technology companies, including Facebook and Twitter.  Indeed, Chan described himself as "one of the primary people with pass-through information,"[2] information that the companies used when deciding whether to restrict online content.

3.      After Chan failed to voluntarily appear before the Committee, it subpoenaed him to testify at a deposition.  But Chan defied the Subpoena.  Chan's employer, the U.S. Department of Justice (DOJ), instructed him not to appear, and he complied with that directive.  By refusing to comply with the Subpoena, Chan is frustrating the Committee's ability to conduct oversight— a critical part of the legislative power that the Constitution vests in Congress.

---

[2] *See* Proposed Ex. A to Motion for Leave to File Excess Pages at 105, *Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La. Dec. 5, 2022), ECF No. 144-2 (Chan Dep.).

4.      Neither Chan nor DOJ has disputed that the Committee's investigation is lawful. Nor have they disputed that Congress has the authority to pass legislation addressing the topic of the Committee's investigation.  Indeed, multiple other Executive Branch officials have appeared before the Committee as part of its inquiry.  Rather, DOJ has directed Chan to defy the Committee's Subpoena only because, under House Rules, agency counsel (a lawyer who represents the Executive Branch's interests, not Chan's) cannot attend.  Despite the Constitution's clear command that each chamber of Congress "may determine the Rules of its Proceedings,"[3] DOJ contends that a subpoena compelling testimony about an agency employee's official duties, without agency counsel present, is unconstitutional and thus unenforceable.

5.      The House's legal authority and rationale for adopting the rule at issue are straightforward.  A rule that dictates who may attend committee depositions is a rule that governs House proceedings and thus easily falls within its rulemaking authority under the Constitution. The House has decided to exercise its constitutional authority in this manner because it protects the integrity of its investigations: a witness may be less willing to share information that reflects poorly on his employing agency if that agency's lawyer is sitting right next to him.

6.      The deposition rule is not new.  Indeed, the House has adopted variations of this rule since the 1980s, when it first began delegating deposition authority to select committees and task forces.  And to date, more than 175 Executive Branch employees have appeared for depositions without agency counsel.

7.      Even though the Committee believes that DOJ's current view of the deposition rule has no legal merit, the Committee offered accommodations to alleviate DOJ's concerns and avoid the need for litigation.  The Committee would allow agency counsel to be present just

---

[3] U.S. Const. art. I, § 5, cl. 2.

outside the room where the deposition would be held, and it offered to recess the deposition anytime Chan or his personal counsel wished to confer with agency counsel.

8.      DOJ rejected those reasonable accommodations, and Chan has refused to appear for a deposition.  Chan's failure to comply with the Subpoena is impeding the Committee's investigation into a matter of significant public concern, and the Committee asks this Court to compel him to appear forthwith.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This case arises under Article I of the Constitution of the United States and implicates Article I, Section 1, which vests "[a]ll legislative Powers" in the Congress of the United States.

10.     This Court has authority to issue a declaratory judgment and order other just and proper relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 1391(e)(1).

## PARTIES

12.     Plaintiff Committee on the Judiciary of the United States House of Representatives is a standing committee of the House that, among other duties, conducts oversight of DOJ.  The FBI is a DOJ component.

13.     Defendant Elvis Chan serves as Assistant Special Agent in Charge of the Cyber Branch for the San Francisco Division of the FBI and has worked for the FBI for over seventeen years.

## ALLEGATIONS

I.   **The Committee's constitutional authority to conduct investigations and to issue subpoenas to advance its investigations**

14.    Article I of the Constitution vests Congress with "[a]ll legislative Powers."[4]

Those powers include the authority to investigate matters relating to subjects within its broad

legislative purview; conduct oversight of Executive Branch agencies; examine whether

Executive Branch agencies are faithfully, effectively, and efficiently executing the laws; and

determine whether changes to federal law are necessary and proper.  For nearly a century, the

Supreme Court has recognized that the Constitution vests the House with "the power of

inquiry—with process to enforce it"—commensurate with the House's Article I legislative

authority to investigate any subject on which "legislation could be had."[5]

15.    The Constitution commits to each chamber of Congress the authority to

"determine the Rules of its Proceedings."[6]  Pursuant to this authority, the 118th House of

Representatives adopted the Rules of the House of Representatives (House Rules) to govern

itself during the current Congress.[7]  The House Rules establish various standing committees,

including the Judiciary Committee, and delegate to each committee "jurisdiction and related

functions."[8]

---

[4] U.S. Const. art. I, § 1, cl. 1.

[5] *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).

[6] U.S. Const. art. I, § 5, cl. 2.

[7] *See* H. Res. 5, 118th Cong. § 1 (2023) (adopting House Rules for the 118th Congress), https://perma.cc/28AM-XD4R; *see also* House Rules, 118th Congress (Jan. 10, 2023), https://perma.cc/3UX4-2YG5.

[8] House Rule X.1.

16.     The Judiciary Committee's legislative and oversight jurisdiction includes, among other subjects, civil liberties,[9] including, for example, statutes that impose liability on federal officials who violate a person's constitutional rights.[10]   The Judiciary Committee exercises jurisdiction (among other matters) over legislation relating to civil liberties, including legislation that imposes liability on government officials who violate First Amendment rights.[11]   The House Rules further mandate that "[a]ll bills, resolutions, and other matters relating to" subjects within the Judiciary Committee's jurisdiction be referred to the Judiciary Committee for its consideration.[12]

17.     As a standing committee, the Judiciary Committee also has "general oversight responsibilities," including with respect to the "operation of Federal agencies and entities" within its areas of jurisdiction.[13]   As such, the Judiciary Committee exercises oversight of the structure and functions of DOJ and the FBI.[14]   Among other responsibilities, the Judiciary Committee is charged with reviewing "on a continuing basis … the application, administration, execution, and

---

[9] House Rule X.1(*l*)(5).

[10] *See, e.g.*, 42 U.S.C. § 1983.

[11] *See, e.g.*, H.R. 4848, 118th Cong. (2023) (the "Censorship Accountability Act"); 169 Cong. Rec. H3948 (daily ed. July 25, 2023) (referring H.R. 4848, the "Censorship Accountability Act," to the Judiciary Committee), https://perma.cc/6T85-JVEA.

[12] House Rule X.1.

[13] House Rule X.2(a), (b)(1)(B).

[14] *See, e.g.*, *Oversight of DOJ Before the H. Comm. on the Judiciary*, 118th Cong. (Sept. 20, 2023) (oversight hearing conducted with Attorney General Merrick Garland), https://perma.cc/3UQU-WW3H; *Oversight of the FBI Before the H. Comm. on the Judiciary*, 118th Cong. (July 12, 2023) (oversight hearing with FBI Director Christopher Wray), https://perma.cc/B9UU-3P2J.

effectiveness of laws and programs" within its jurisdiction.[15]  The Judiciary Committee must

determine whether such laws are being "implemented and carried out in accordance with the

intent of Congress" and if there are "any conditions or circumstances that may indicate the

necessity or desirability of enacting new or additional legislation."[16]

18.     The House Rules empower any standing committee, including the Judiciary

Committee, to "conduct at any time such investigations and studies as it considers necessary or

appropriate in the exercise of its responsibilities" over matters within its jurisdiction.[17]  To aid

these inquiries, the Judiciary Committee, like all standing committees, is authorized to issue

subpoenas for testimony and documents.[18]

19.     For the 118th Congress, the House also established a select investigative

subcommittee of the Judiciary Committee called the Select Subcommittee on the Weaponization

of the Federal Government (Select Subcommittee).[19]  Among other things, the Select

Subcommittee "is authorized and directed" to investigate "any other issues related to the

violation of the civil liberties of citizens of the United States."[20]

---

[15] House Rule X.2(b)(1)(A).

[16] House Rule X.2(b)(1)(C).

[17] House Rule XI.1(b)(1).

[18] *See* House Rule XI.2(m)(1)(B), (3)(A)(i); *see also* Rule IV(a), Rules of the Committee on the Judiciary of the U.S. House of Representatives, 118th Cong. (2023) (Judiciary Committee Rules) ("A subpoena may be authorized and issued by the Chair, in accordance with clause 2(m) of rule XI of the House of Representatives, in the conduct of any investigation or activity or series of investigations or activities within the jurisdiction of the Committee, following consultation with the Ranking Minority Member."), https://perma.cc/6UUS-LYEH.

[19] H. Res. 12, 118th Cong. § 1(a)(1) (2023).

[20] *Id.* § 1(b)(1)(E).

20.     In sum, the Judiciary Committee has constitutional and other legal authority to investigate the FBI's coordination with social media and other technology companies regarding online speech and to develop legislative reforms to address that topic.

## II.     The Judiciary Committee's investigation into whether and how Executive Branch agencies worked with technology companies to censor speech online

21.     Before the 118th Congress began in January 2023, publicly available information—including contemporaneous private emails—demonstrated that Executive Branch agencies and technology companies shared information with each other and regularly met to discuss, among other things, whether certain content should be viewable on the companies' online platforms.  Much of this information surfaced through litigation, *Missouri v. Biden*,[21] or journalism that was based on internal Twitter communications (the Twitter files).

### A.     Publicly available information details coordination between the Executive Branch—including the FBI and Chan—and technology companies

22.     In May 2022, Missouri and Louisiana sued various Executive Branch officials in *Missouri v. Biden*.[22]  The complaint alleged that "senior government officials in the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media platforms."[23]  It further alleged, among other things, that Executive Branch officials had regularly met with representatives from social media companies to discuss how to suppress certain content that appeared on the

---

[21] No. 3:22-cv-01213-TAD-KDM (W.D. La.).

[22] *See generally* Compl., *Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La. May 5, 2022), ECF No. 1.

[23] *Id.* ¶ 3.

companies' platforms.[24]  The Executive Branch officials' actions, according to the complaint,

violated the First Amendment.[25]  In early October 2022, the plaintiffs in that case filed a second

amended complaint that named the FBI and Chan as defendants.[26]  It identified the FBI's Foreign

Influence Task Force (FBI Task Force) as an entity involved in coordinating with social media

companies to censor speech.[27]

23.    The second amended complaint in *Missouri v. Biden* made several allegations

about Chan's involvement in censorship-related issues, based on documents Meta Platforms

(Facebook's parent company) provided to plaintiffs pursuant to a third-party subpoena.[28]

24.    For example, the second amended complaint alleged that Chan, a supervisory

agent in the FBI's San Francisco Division—the office with the responsibility for the geographic

territory where several major social media platforms and technology companies are

---

[24] *See, e.g.*, *id.* ¶¶ 178-82, 199-200, 208.

[25] *See id.* ¶¶ 242-59.

[26] *See* Second Amended Compl. ¶¶ 59, 61, *Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La. Oct. 6, 2022), ECF No. 84.  Before the plaintiffs filed their second amended complaint, in August 2022, the *Wall Street Journal* published an opinion piece that discussed private Twitter communications that showed Twitter banned an account in August 2022 after "clearly [being] under White House pressure to do so."  *See* Editorial Board, *The White House and Twitter Censorship*, Wall St. J. (Aug. 12, 2022, 6:38 PM), https://perma.cc/NWZ9-4JK7. Roughly a month later, the *Wall Street Journal* published another opinion piece that analyzed internal Facebook documents that were produced during discovery in *Missouri v. Biden*.  *See* Editorial Board, *How the Feds Coordinate With Facebook on Censorship*, Wall St. J. (Sept. 9, 2022, 7:05 PM), https://perma.cc/P2T4-7SGK (describing emails between Executive Branch officials and Facebook related to what content Facebook would allow on its platform).

[27] *See* Second Amended Compl. ¶¶ 61, 384-85.  The Task Force is charged with impeding "malign foreign-influence campaigns."  *See* Chan Dep., *supra* note 2, at 36.

[28] *See* Second Amended Compl. ¶ 384.

headquartered—"performed a critical role in communicating with social-media platforms on behalf of the FBI [about] censorship and suppression of speech on social media."[29]

25.     The second amended complaint quoted from an interview that Chan gave on a podcast: "we talked with all of these entities I mentioned regularly, at least on a monthly basis. And right before the election, probably on a weekly basis.  If they were seeing anything unusual, if we were seeing anything unusual, sharing intelligence with technology companies, *with social media companies*, so that they could protect their own platforms.  That's where the FBI and the US government can actually help companies."[30]

26.     The second amended complaint, based on documents that LinkedIn produced, alleged that Chan "repeatedly organiz[ed] meetings with representatives of LinkedIn" and other social media companies.[31]

27.     A few weeks after the filing of the second amended complaint, in late October 2022, *The Intercept* published an article (based on its review of "[y]ears of internal [Executive Branch agency] memos, emails, and documents") about the Executive Branch's effort "to influence tech platforms" "to curb speech it considers dangerous."[32]  The article, like the second amended complaint, noted the FBI's involvement in these efforts and mentioned Chan by name.[33]

---

[29] *See id.* ¶¶ 61, 386.

[30] *Id.* ¶ 389.

[31] *Id.* ¶ 392.

[32] *See* Ken Klippenstein & Lee Fang, *Truth Cops: Leaked Documents Outline DHS's Plans to Police Disinformation*, Intercept (Oct. 31, 2022, 5:00 AM), https://perma.cc/U3NR-ZBPE.

[33] *Id.*

28.      Roughly one month later, in December 2022, a series of installments called the Twitter files were posted on Twitter.[34]  The installments were "based upon thousands of internal documents obtained by sources at Twitter."[35]  Like the *Missouri v. Biden* second amended complaint and *The Intercept* article, the Twitter files documented the FBI's interactions with technology companies.  Indeed, one of the installments was named "The Twitter Files, Part Six, TWITTER, THE FBI SUBSIDIARY."[36]  According to the person who reviewed Twitter's internal files, "Twitter's contact with the FBI was constant and pervasive, as if it were a subsidiary."[37]

29.      The Twitter files installments included screenshots of several emails between Chan and Twitter representatives.

30.      One installment describes an email from Chan to a Twitter executive where "Chan arranges for temporary Top Secret security clearances for Twitter executives so that the FBI can share information about threats to the upcoming [2020] elections."[38]

---

[34] *See* Matt Taibbi (@mtaibbi), Twitter (Dec. 2, 2022, 6:41 PM), https://perma.cc/KMY2-X244.

[35] Matt Taibbi (@mtaibbi), Twitter (Dec. 2, 2022, 6:39 PM), https://perma.cc/LV5D-WGW5.

[36] *See* Matt Taibbi (@mtaibbi), Twitter (Dec. 16, 2022, 4:00 PM), https://perma.cc/2HFY-XET8.

[37] *See* Matt Taibbi (@mtaibbi), Twitter (Dec. 16, 2022, 4:00 PM), https://perma.cc/H4WK-R8CN.

[38] Michael Shellenberger (@shellenberger), Twitter (Dec. 19, 2022, 12:25 PM), https://perma.cc/B2LX-CB8J.

31.     Another shows an email where Chan described "an encrypted messaging network" that would allow "employees from FBI & Twitter [to] communicate."[39]

32.     Yet another reveals that Chan sent Twitter representatives a list of Twitter accounts that the FBI believed were "disseminating false information."[40]

33.     Around the same time, Chan was deposed in *Missouri v. Biden*, and the full deposition transcript was made publicly available in December 2022.[41] In his deposition, Chan described his role as an FBI employee sharing information and working with social media companies as they determined whether certain content should be viewable on the companies' respective platforms.[42]

34.     In the midst of this public reporting, which took place near the end of the 117th Congress, then-Ranking Member Jim Jordan and other Republican Members of the Judiciary Committee wrote to the FBI.[43] The letter explained that the Committee would "require prompt testimony from FBI employees"—including Chan—"early in the 118th Congress" "to advance [its] oversight."[44]

---

[39] Michael Shellenberger (@shellenberger), Twitter (Dec. 19, 2022, 12:56 PM), https://perma.cc/72PT-BYZB.

[40] Matt Taibbi (@mtaibbi), Twitter (Dec. 16, 2022, 4:00 PM), https://perma.cc/24X9-KPRF.

[41] *See Missouri, Louisiana release full transcript of deposition with FBI Agent Elvis Chan regarding collusion with social media companies*, KTTN News (Dec. 7, 2022), https://perma.cc/3H7S-LDGL.

[42] We explain this in more detail in paragraphs 44 through 53.

[43] *See generally* Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, et al., to Christopher A. Wray, Director, FBI (Nov. 18, 2022), https://perma.cc/9W3B-BPW6.

[44] *Id.* at 1.

**B.     The Committee's investigation of the threat to Americans' civil liberties posed by government censorship**

35.     During the 118th Congress, the Committee has been investigating "the extent to which the Executive Branch has coerced and colluded with companies and other intermediaries to censor speech."[45]

36.     Under House Rules, the Committee has legislative and oversight jurisdiction over civil liberties,[46] and, as the Committee has explained, "a government-approved or -facilitated censorship regime is a grave threat to the First Amendment and American civil liberties."[47] According to the Committee, "[t]he entanglement of Executive Branch agencies, third-party organizations, and technology companies to moderate speech-related content online raises questions about the extent to which these actions affected the civil liberties of American citizens."[48]

37.     During its investigation, the Committee, among other steps, has reviewed hundreds of thousands of pages of documents produced by the Executive Branch and by technology companies, interviewed roughly thirty witnesses, and held four oversight hearings.[49]

---

[45] *See generally* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Dr. Marc Tessier-Lavigne, President, Stanford Univ., at 1 (Mar. 10, 2023) (attached as Ex. B).

[46] House Rule X.1(*l*)(5).

[47] *See* Ex. B at 1.

[48] *Id.* at 2.

[49] *Hearing on the Weaponization of the Federal Government Before the H. Select Subcomm. on the Weaponization of the Federal Government*, 118th Cong. (Nov. 30, 2023) (noting the hearing "will examine the federal government's involvement in social media censorship"), https://perma.cc/ZVL5-USCU; *Hearing on the Weaponization of the Federal Government Before the H. Select Subcomm. on the Weaponization of the Federal Government*, 118th Cong. (July 20, 2023) (noting "[t]he hearing will examine the federal government's role in censoring Americans, the *Missouri v. Biden* case, and Big Tech's collusion with out-of-control

38.     The Committee has subpoenaed communications between the Executive Branch and Alphabet (the parent company of Google), Amazon, Apple, Meta Platforms, and Microsoft, as well as these companies' internal communications and their communications with third parties that may have also been working with the Executive Branch.[50]

39.     The Committee has interviewed Executive Branch officials, including Laura Dehmlow, the Section Chief of the FBI's Task Force, who, like Chan, regularly met with technology companies to discuss content moderation.[51]

---

government agencies to silence speech"), https://perma.cc/E3X8-9RRY; *Hearing on the Weaponization of the Federal Government Before the H. Select Subcomm. on the Weaponization of the Federal Government*, 118th Cong. (Mar. 30, 2023) (noting "[t]he hearing will examine the *Missouri v. Biden* case challenging the administration's violation of the First Amendment by directing social media companies to censor and suppress Americans' free speech"), https://perma.cc/82MH-QVCQ; *Hearing on the Weaponization of the Federal Government on the Twitter Files Before the H. Select Subcomm. on the Weaponization of the Federal Government*, 118th Cong. (Mar. 9, 2023), https://perma.cc/6W6U-9R3V.

[50] *See generally* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Sundar Pichai, CEO, Alphabet (Feb. 15, 2023), https://perma.cc/5NZH-XRHW; Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Andy Jassy, CEO, Amazon (Feb. 15, 2023), https://perma.cc/ZC5Q-WZSG; Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Timothy Cook, CEO, Apple (Feb. 15, 2023), https://perma.cc/MLL2-9U4R; Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark Zuckerberg, CEO, Meta Platforms (Feb. 15, 2023), https://perma.cc/6L9H-GEW9; Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Satya Nadella, CEO, Microsoft (Feb. 15, 2023), https://perma.cc/6S5U-F499.

[51] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Christopher A. Wray, Director, FBI, at 1 (July 20, 2023), https://perma.cc/68HL-QJTN (July 20, 2023 Letter).

40.     The Committee has also interviewed employees of various technology companies, including Yoel Roth, the former head of Twitter's trust and safety department,[52] and "a senior employee on Google's cybersecurity team."[53]

41.     As part of its investigation, the Committee is considering whether certain legislative reforms are needed to address this problem.  For example, the Committee is considering "new statutory limits on the Executive Branch's ability to work with technology companies to restrict the circulation of content and deplatform users."[54]  It is also evaluating whether it should "amend[] liability protections," such as 47 U.S.C. § 230(c)(2)(B), "for companies that create or disseminate censorship tools."[55]

42.     But as the Committee itself has recognized, to decide whether legislative reforms are needed, and to determine how best to craft those reforms, "the Committee … must first understand how and to what extent the Executive Branch coerced and colluded with companies

---

[52] *See generally* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Yoel Roth, Former Head of Trust & Safety, Twitter (Aug. 18, 2023), https://perma.cc/X9B3-VAQ3.

[53] Staff of H. Comm. on the Judiciary & Select Subcomm. on the Weaponization of the Federal Government, 118th Cong., Rep. on *The FBI's Collaboration with a Compromised Ukrainian Intelligence Agency to Censor American Speech* 19 (Comm. Print 2023), https://perma.cc/G8YG-9NX3; *see also* Annie Grayer & Donie O'Sullivan, *Jim Jordan scraps committee contempt vote on Mark Zuckerberg*, CNN (July 27, 2023, 2:53 PM), https://perma.cc/66RS-ATM4 (noting that Facebook "has allowed 10 employees to do transcribed interviews" with the Committee).

[54] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Ed Bice, CEO, Meedan, at 2 (Aug. 15, 2023) (attached as Ex. C).

[55] *See id.*

and other intermediaries to censor speech."[56]  As the Supreme Court has explained, "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."[57]

43.    To inform the Committee's understanding of how the Executive Branch has worked with technology companies to censor speech, "[i]t is necessary for Congress to gauge the extent to which FBI agents coerced, pressured, worked with, or relied upon social media and other tech companies to censor speech."[58]  Thus, "[t]he scope of the Committee's investigation includes understanding the extent and nature of the FBI's involvement in this censorship."[59] Chan—who was at the center of the FBI interactions with these companies—possesses information that is important to the Committee's investigation.

**C.    Chan has firsthand knowledge—based on personal experience—that is critical to the Committee's investigation**

44.    Many of the technology companies that the FBI interacted with, including Facebook, Twitter, and Google, are headquartered in the San Francisco area,[60] the territory for

---

[56] *See id.*

[57] *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (alteration in original) (quoting *McGrain*, 273 U.S. at 175).

[58] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Elvis Chan, Assistant Special Agent in Charge, S.F. Field Off., FBI, at 2 (Sept. 15, 2023), https://perma.cc/XGF8-EE5B (Sept. 15, 2023 Letter).

[59] *Id.*

[60] *Facebook Headquarters*, Facebook (last visited Feb. 3, 2024), https://perma.cc/F3YV-PP6R; Rebecca Carballo,  *'X' on Twitter's Headquarters Faces Investigation Over Permit Violations*, N.Y. Times (July 30, 2023), https://perma.cc/CVQ4-P4G7; *About*, Google (last visited Feb. 4, 2024), https://perma.cc/6QCG-R4PH.

which Chan is responsible as part of his official FBI duties.[61]  Chan was thus "responsible for

maintaining the day-to-day relationships with th[ose] companies"[62] and "was one of the primary

people communicating with social-media platforms about disinformation on behalf of the FBI."[63]

During his deposition in *Missouri v. Biden*, Chan described how the FBI worked with these

various companies.

45.    Chan explained that the FBI had shared information, including "strategic-level

information as well as tactical information," with private technology companies.[64]  The

information sharing was done through "industry working group" meetings.[65]

46.    Chan has personal knowledge of both the logistics and the substance of these

meetings.  Indeed, he participated in internal preparatory meetings and attended the working

group meetings themselves.[66]  In fact, he was the second-highest ranking FBI attendee.[67]  To use

his words, Chan described himself as "one of the primary people with pass-through

---

[61] *See* Chan Dep., *supra* note 2, at 24-25.

[62] *Id.* at 24-25.

[63] *Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270, at *27 (W.D. La. July 4, 2023), *aff'd in part, rev'd in part*, 80 F.4th 641 (5th Cir. 2023), *aff'd in part, rev'd in part*, 83 F.4th 350 (5th Cir. 2023), *and cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7 (2023).

[64] Chan Dep., *supra* note 2, at 16.

[65] *See id.* at 18-19, 23-24.

[66] *Id.* at 24-25, 27.

[67] *Id.* at 109.

information."[68]  And he led a team of other FBI agents who regularly communicated with social media companies about "disinformation."[69]

47.     Starting with logistical matters, Chan has personal knowledge of who attended the industry working group meetings.  At his deposition, Chan named the Executive Branch agencies that were represented: the FBI, DOJ's National Security Division, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency and Office of Intelligence and Analysis, and the Office of the Director of National Intelligence.[70]  He also listed the private technology companies that were represented: Facebook, Microsoft, Google, Twitter, Yahoo!, LinkedIn, Wikimedia Foundation, Apple, and Reddit.[71]  Beyond knowing which technology companies were represented at the meetings, Chan is familiar with the individuals who attended. For example, he noted that the technology companies' representatives who attended the meetings were involved in enforcing their respective company's terms of service, including those related to content moderation.[72]

48.     Chan also has personal knowledge of how frequently these meetings took place. For example, according to Chan, during the 2018 election cycle, these meetings occurred on a quarterly basis.[73]  During the first half of 2020 and 2022, these meetings also occurred quarterly,

---

[68] *Id.* at 105.

[69] *Id.* at 104-09.

[70] *Id.* at 24, 171.

[71] *See id.* at 23-24, 41-42.

[72] *Id.* at 49-50.

[73] *Id.* at 42.

then progressed to monthly for the last half of those years, and finally there was one meeting the week before the elections.[74]

49.     Chan's firsthand knowledge is not limited to mundane logistical issues.  Rather, because he participated in the meetings, he is personally familiar with the substance discussed.

50.     For example, Chan said that during these meetings, technology companies "would provide a strategic overview of the type of disinformation they were seeing on their respective platforms."[75]

51.     Chan explained that the FBI, in turn, shared both strategic and tactical information about Russia, China, and Iran.[76]  Chan himself provided tactical information to the technology companies.[77]  He thus has firsthand knowledge—based on personal experience—of the methods and timing of the FBI's sharing of tactical information.

52.     Beginning with the methods, Chan said that he would typically share tactical information by sending a secure file, followed by "a heads-up email" so that the companies knew to look for the link to the secure file.[78]  As for timing, Chan testified that the FBI would "typically share information either right before or after one of [the] quarterly meetings" or when the field office running the investigation deemed it appropriate.[79]  According to Chan, he shared

---

[74] *See id.* 19-20, 39-40.

[75] *Id.* at 156.

[76] *Id.* at 29-30, 31-32, 94-95.

[77] *Id.* at 98-99.

[78] *See id.*

[79] *Id.* at 98.

information approximately one to six times per month in 2020 and one to four times per month in 2022.[80]

53.     Chan's firsthand knowledge goes beyond the information sharing itself: based on what he has "observed" and what he has been told directly by the technology companies, he knows what the technology companies do after they receive information from the FBI.[81] According to Chan, the companies "take the information that [the FBI] share[s], they validate it through their own means," and they "take whatever actions they deem appropriate."[82]  Those actions, Chan said, include removing accounts or content from their platforms.[83]  In fact, Chan "will document" when the companies take action based on the information the FBI provides.[84]

### D.    The Committee has uncovered additional information during its investigation that highlights the need for Chan's testimony

54.     The Committee's investigation began two months after Chan was deposed in *Missouri v. Biden*.  During its investigation, the Committee has uncovered information that reinforces its need for Chan's testimony.  For example, Chan is uniquely positioned to shed light on unanswered questions regarding the Executive Branch's treatment of the Hunter Biden laptop story.

55.     On October 14, 2020, the *New York Post* published a story that included a screenshot of an email to Hunter Biden that, according to the article, contradicted a statement

---

[80] *Id.* at 100-01.

[81] *See id.* at 32-33.

[82] *Id.* at 33-34.

[83] *See, e.g.*, *id.* at 32-33, 35.

[84] *Id.* at 102-03.

that President Biden made when he was campaigning for office.[85]  That email, the article claimed, was "contained in a massive trove of data recovered from a laptop computer."[86]

56.     The same day, after the *New York Post* story was published, the FBI met with Facebook.[87]  Chan participated in that meeting.[88]  During that meeting, a Facebook employee asked a question related to Hunter Biden, and an FBI official said "that the FBI had no comment."[89]  At his *Missouri v. Biden* deposition, Chan testified that, other than this meeting on October 14, 2020, he was unaware of any other communications between the FBI and Facebook about the Hunter Biden laptop story.[90]

57.     But Facebook has produced documents to the Committee that suggest Chan himself had additional conversations with Facebook employees about the Hunter Biden laptop story after the October 14 meeting.  For example, in an internal Facebook communication, a Facebook employee said that he had spoken to Chan on October 15, 2020, about the Hunter Biden laptop news story.[91]  The employee also noted that Chan had said "that he was up to speed on the current state of the matter within the FBI."[92]

---

[85] *See* Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad*, N.Y. Post (Oct. 14, 2020, 5:00 AM), https://perma.cc/7AZU-GC23.

[86] *Id.*

[87] *See* July 20, 2023 Letter, *supra* note 51, at 3.

[88] *See* Chan Dep., *supra* note 2, at 212-14.

[89] *Id.* at 213.

[90] *Id.* at 233-34.

[91] *See* Ex. D at 2.

[92] *Id.*

58.     The Committee intends to ask Chan about this follow-up conversation (and any others) so that it can better understand how the FBI may have influenced the way that Facebook handled the Hunter Biden laptop story.

59.     After all, Facebook's CEO has explained the context in which Facebook analyzed the *New York Post* story: "[t]he background here is that the FBI came to us—some folks on our team—and was like 'hey, just so you know, you should be on high alert.  We thought there was a lot of Russian propaganda in the 2016 election, we have it on notice that basically there's about to be some kind of dump that's similar to that.'"[93]  Facebook determined the story "fit that pattern" and restricted its users from sharing the article.[94]

60.     The Committee has also discovered during its investigation that the FBI deliberated internally about what information related to the Hunter Biden laptop news story to share with technology companies.[95]  It ultimately decided that it would say "no comment," which, according to testimony from Dehmlow, the Section Chief of the FBI's Task Force, led to the FBI's answer to the Facebook employee's question during the October 14, 2020 meeting.[96] The FBI made this decision despite possessing the laptop and having determined that it was authentic and, thus, not the product of Russian propaganda.[97]

---

[93] *See* David Molloy, *Zuckerberg tells Rogan FBI warning prompted Biden laptop story censorship*, BBC (Aug. 26, 2022, 1:41 EDT), https://perma.cc/RFK9-R7E6.

[94] *Id.*

[95] *See* July 20, 2023 Letter, *supra* note 51, at 3.

[96] *Id.*

[97] *See, e.g.*, *id.* at 1, 3-4.

61.     The Committee intends to ask Chan about this decision, including if the FBI considered whether and how its answer would affect the way the technology companies treated the *New York Post* story, especially in light of its prior warnings to the companies about Russia. Beyond that, the internal Facebook communication discussed above suggests that Chan may have shared information about the Hunter Biden laptop story with a Facebook employee on October 15, 2020, and the Committee intends to ask Chan about that topic, including how he decided what information to share and whether he expected that information to influence Facebook.

62.     The FBI's coordinated "no comment" response also raises the question of whether the FBI handled other news stories in a similar way.  As the primary contact between the FBI and the technology companies, Chan is uniquely qualified to shed light on that and other topics.

63.     For example, the Committee has also learned that Chan interacted with Stanford University's Election Integrity Partnership (Partnership), a group that may have worked with the federal government to censor online speech before the 2020 election.[98]  But Chan testified during his deposition that he did not talk to anyone at the Partnership and thought he learned about the Partnership simply by reading a news article.[99]  The Committee intends to ask Chan about his work with this Partnership.

64.     In sum, the technology companies worked with the Executive Branch, and the FBI and Chan in particular, as they made decisions about what content and accounts to allow on

---

[98] Staff of the H. Judiciary Comm. & H. Select Subcomm. on the Weaponization of the Federal Government, 118th Cong., Rep. on *The Weaponization of "Disinformation" Pseudo-Experts and Bureaucrats: How the Federal Government Partnered with Universities to Censor Americans' Political Speech* 1, 64 (2023), https://perma.cc/UA43-QDFL.

[99] *See* Chan Dep., *supra* note 2, at 56-58.

their platforms.  This coordination is the very issue that the Committee is investigating.  Chan is uniquely positioned to aid the Committee's investigation because he had primary responsibility for the FBI's relationship with many of the relevant technology companies.  Indeed, he was personally responsible for sharing information with the companies, and he documented the actions that companies took based on the information he provided.  He thus has firsthand knowledge, based on his own personal experience, that will allow the Committee to better understand the nature of the relationship between the Executive Branch and these companies.

65.    As a result, Chan's appearance to provide testimony will constitute a critical piece of the Committee's investigation.

### E.    The Committee's monthslong effort to interview Chan voluntarily

66.    During the first month of the 118th Congress, on January 17, 2023, Chairman Jordan wrote to FBI Director Wray to request testimony from specified FBI employees, including Chan, and asked that the FBI make those employees available for, as relevant here, voluntary transcribed interviews to aid the Committee's oversight investigation.[100]

67.    A voluntary transcribed interview is one method that Congressional committees use to obtain and document oral testimony from witnesses.  Generally speaking, transcribed interviews, while still on the record, are a less formal investigative method than depositions.  Unlike a person who is subpoenaed to appear for a deposition, witnesses asked to appear for a transcribed interview have no legal obligation to do so.

---

[100] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Christopher A. Wray, Director, FBI, at 1 (Jan. 17, 2023), https://perma.cc/5ZZQ-MWEB; *id.* at 3 (attaching letter dated November 18, 2022, that listed Chan among the FBI employees from whom the Committee would require testimony).

68.    The Committee allows Executive Branch employees who voluntarily appear for a transcribed interview to do so with either a lawyer who the witness has personally retained (personal counsel) or a lawyer who works for the witness's employing agency (agency counsel).[101]  The witness cannot, however, appear with both personal counsel and agency counsel.[102]

69.    Because a witness may be less forthcoming when a lawyer who represents his employer is physically present in the room,[103] the Committee generally prefers that a witness who appears for a voluntary transcribed interview do so with personal counsel.  But as a courtesy to the witness, the Committee allows an Executive Branch employee to appear for a voluntary transcribed interview with agency counsel if the witness would prefer to avoid the expense of hiring a personal lawyer.[104]  Once the witness retains personal counsel and incurs any related legal expense, in the Committee's view, there is no reason to permit agency counsel to also accompany the already-represented witness.[105]

70.    The Committee notified the FBI near the beginning of the 118th Congress, in late January 2023, that FBI employees appearing for a voluntary transcribed interview could do so

---

[101] *See, e.g.*, Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Christopher A. Wray, Director, FBI, at 5 (Sept. 20, 2023) (attached as Ex. E).

[102] *Id.*

[103] *See id.*

[104] *See id.*

[105] *See, e.g.*, *id.* at 4.

with personal counsel or agency counsel, but not both.[106]  This practice—which governs only voluntary transcribed interviews—is not at issue in this case but, as discussed below, is relevant to the Committee's good-faith efforts to interview Chan voluntarily.

71.    After the FBI failed to provide dates that Chan was available for an interview in response to the January 17 letter, the Committee again, on March 3, 2023, wrote to the FBI and requested that Chan appear voluntarily for a transcribed interview.[107]

72.    After the FBI failed to confirm that Chan would soon appear for an interview with the Committee in response to the March 3 letter, the Committee repeated to FBI and DOJ personnel, throughout April and May, its request to schedule a voluntary transcribed interview with Chan.

73.    Throughout the summer of 2023, the Committee continued its efforts to schedule a voluntary transcribed interview with Chan.  During those months, Committee staff sent DOJ personnel multiple emails aimed at securing such an interview.[108]

---

[106] *See* Email from Stephen Castor, Gen. Couns., H. Comm. on the Judiciary, to Megan Greer, Acting Unit Chief & Assistant Gen. Couns., Congressional Oversight & Investigations Unit, FBI (Jan. 31, 2023, 11:51 AM) (attached as Ex. F at 1).

[107] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Christopher A. Wray, Director, FBI, at 1 (Mar. 3, 2023) (attached as Ex. G).

[108] *See, e.g.*, Email from Betsy Ferguson, Deputy Gen. Couns., H. Comm. on the Judiciary, to Megan Greer, Acting Unit Chief & Assistant Gen. Couns., Cong. Oversight & Investigations Unit, FBI (July 5, 2023, 12:22 PM) (attached as Ex. H at 1); Email from Betsy Ferguson, Deputy Gen. Couns., H. Comm. on the Judiciary, to Megan Greer, Acting Unit Chief & Assistant Gen. Couns., Cong. Oversight & Investigations Unit, FBI (Aug. 8, 2023, 5:05 PM) (attached as Ex. H at 1); Email from Caroline Nabity, Chief Counsel for Oversight, H. Comm. on the Judiciary, to Megan Greer, Acting Unit Chief & Assistant Gen. Couns., Cong. Oversight & Investigations Unit, FBI (Aug. 17, 2023, 1:08 PM) (attached as Ex. H at 1).

74.     Finally, on August 30, 2023—more than seven months after the Committee first requested a transcribed interview with Chan—DOJ agreed to make Chan available for a voluntary transcribed interview on September 15, 2023.[109]

75.     Three days before Chan's scheduled voluntary transcribed interview, on September 12, 2023, Committee staff learned during a phone call with DOJ and FBI personnel that Chan had retained personal counsel, who would accompany him to the interview.

76.     During the same phone call, DOJ and FBI personnel requested that the Committee make an exception to its longstanding protocol and allow Chan to appear with both personal counsel and agency counsel.  As discussed above, under the Committee's protocol, Chan could appear with one or the other, not both, and Committee staff told FBI personnel that an exception to this practice was unlikely to be permitted.

77.     Over the next two days, on September 13 and 14, 2023, Committee staff told both DOJ personnel and Chan's personal counsel that the Committee's standard practice would apply, and no exception would be made for Chan; he could bring agency counsel or personal counsel, but not both.[110]

78.     The day before the scheduled interview, Chan's personal counsel told the Committee that Chan would not participate unless both his personal counsel and agency counsel

---

[109] Email from Mary Doocy, Assistant Gen. Couns., FBI, to Stephen Castor, Gen. Couns., H. Comm. on the Judiciary, et al. (Aug. 30, 2023, 4:00 PM) (attached as Ex. I).

[110] *See, e.g.*, Email from Betsy Ferguson, Deputy Gen. Couns., H. Comm. on the Judiciary, to Matthew Hanson, Off. of Legis. Affs., DOJ (Sept. 14, 2023, 7:37 PM) (attached as Ex. J at 2-3).

could appear.[111]  Later that night, Chan's personal counsel emailed Committee staff and said that

he would "be present on behalf of Mr. Chan tomorrow for the scheduled interview."[112]  That was

the full extent of the evening email from Chan's personal counsel.[113]  Committee staff

understood this message to mean that Chan had chosen to have personal counsel, not agency

counsel, represent him during the voluntary transcribed interview.[114]

79.     Roughly two hours later, at 10:07 p.m. on the night before the scheduled

interview, DOJ personnel emailed Committee staff and said they had "spoken with Mr. Chan and

his strong desire is to be represented by both personal and agency counsel tomorrow.  We look

forward to seeing you at 10am."[115]

80.     Committee staff responded at 11:12 p.m. and again reiterated that Chan did not

have the option to appear with both personal and agency counsel.[116]  Staff explained that Chan

"ha[d] requested personal counsel," and Committee staff "respectfully ask[ed] that [DOJ agency

counsel] not attempt to join."[117]

---

[111] Email from Lawrence Berger, Esq., Mahon & Berger, Esqs., to Caroline Nabity, Chief
Counsel for Oversight, H. Comm. on the Judiciary (Sept. 14, 2023, 12:03 PM) (attached as Ex. K
at 1).

[112] Email from Lawrence Berger, Esq., Mahon & Berger, Esqs., to Betsy Ferguson,
Deputy Gen. Couns., H. Comm. on the Judiciary, et al. (Sept. 14, 2023, 7:57 PM) (attached as
Ex. J at 2).

[113] *See generally id.*

[114] *See* Ex. E at 3.

[115] Email from Matthew Hanson, Off. of Legis. Affs., DOJ, to Betsy Ferguson, Deputy
Gen. Couns., H. Comm. on the Judiciary (Sept. 14, 2023, 10:07 PM) (attached as Ex. J at 2).

[116] Email from Betsy Ferguson, Deputy Gen. Couns., H. Comm. on the Judiciary, to
Matthew Hanson, Off. of Legis Affs., DOJ (Sept. 14, 2023, 11:12 PM) (attached as Ex. J at 1-2).

[117] *Id.* at 1.

81.     The next morning, an hour and twenty minutes before Chan's scheduled interview, DOJ personnel emailed Committee staff and said that Chan would appear at 10:00 a.m. with both personal counsel and agency counsel.[118]  Committee staff again emphasized the Committee's practice and asked DOJ personnel not to cause an incident by entering the room where the voluntary transcribed interview would take place.

82.     Although every other FBI employee who has voluntarily appeared for a transcribed interview with the Committee during the 118th Congress has complied with the Committee's practice,[119] Chan refused to abide by the Committee's policy and did not appear for his voluntary transcribed interview scheduled for September 15, 2023, at 10:00 a.m.

**F.     The Committee subpoenas Chan and offers various accommodations to the Executive Branch**

83.     After Chan failed to appear for his voluntary transcribed interview on September 15, 2023, later that day, Chairman Jordan exercised his authority under the House and Committee rules and subpoenaed Chan to appear for a deposition on September 21, 2023.[120]

84.     Chan has a legal obligation to comply with the Subpoena.[121]

---

[118] Email from Matthew Hanson, Off. of Legis Affs., DOJ, to Betsy Ferguson, Deputy Gen. Couns., H. Comm. on the Judiciary (Sept. 15, 2023, 8:40 AM) (attached as Ex. J at 1).

[119] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Lawrence Berger, Esq., Mahon & Berger Esqs., at 2-3 (Oct. 3, 2023) (attached as Ex. L).

[120] Subpoena from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Elvis Chan, Assistant Special Agent in Charge, S.F. Field Off., FBI (Sept. 15, 2023) (attached as Ex. M).

[121] *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 187-88 (1957) (noting the "unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation").

85.     The cover letter that accompanied the Subpoena explained the nature of the Committee's investigation ("oversight of how and to what extent the Executive Branch has coerced and colluded with companies and other intermediaries to censor speech"), the legislative reforms the Committee is considering (limiting the Executive Branch's ability to work with technology companies to censor content), and why the Committee believes that deposing Chan will further its investigation (he is "the primary liaison between the [FBI Task Force] and social media companies" and thus is "uniquely positioned to aid the Committee's oversight").[122]

86.     Under House Resolution 5, which was passed by the full House, and regulations adopted by the House Committee on Rules (Rules Committee) that govern Committee depositions, agency counsel could not attend Chan's deposition.[123]  As explained below, the decision of the 118th Congress to not allow agency counsel to attend depositions is consistent with the House's longstanding approach to this issue.

87.     On September 19, 2023, DOJ wrote to Chairman Jordan and, relying on a 2019 opinion issued by DOJ's Office of Legal Counsel (OLC), argued that "a subpoena that purports to compel testimony on matters within the scope of an agency employees' official duties, including potentially privileged information, without the presence of agency counsel is without legal effect and cannot constitutionally be enforced."[124]  DOJ noted that it would make Chan

---

[122] Sept. 15, 2023 Letter, *supra* note 58, at 1.

[123] H. Res. 5, 118th Cong. § 3(k)(3) (2023); 169 Cong. Rec. H147 (daily ed. Jan. 10, 2023), https://perma.cc/ZUK8-CECR.

[124] Letter from Christopher Dunham, Acting Assistant Director, FBI, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 5 (Sept. 19, 2023) (citing *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019)) (attached as Ex. N).

available for a voluntary transcribed interview, accompanied by agency and personal counsel, after September 29, 2023, when Chan would return from official travel.[125]

88.    On September 20, 2023, Chairman Jordan wrote to the FBI, reiterating that "[t]he Committee requires testimony from Mr. Chan to advance its oversight and inform potential legislative reforms."[126]  He explained that the Committee would postpone the deposition to October 5, 2023, to accommodate Chan's travel plans,[127] and the next day Chairman Jordan issued a new Subpoena that required Chan to appear for a deposition on October 5, 2023.[128] Chan has a legal obligation to comply with the new Subpoena.

89.    On October 2, 2023, Chan's personal counsel emailed Committee staff a letter dated September 29, 2023, explaining that Chan would appear for the deposition "only with the assistance of both private counsel and agency counsel."[129]  The letter questioned whether the Committee had the constitutional authority to exclude agency counsel from depositions, and it quoted from and attached the same DOJ OLC opinion that DOJ relied on in its September 19 letter.[130]  The letter noted that Chan "may be asked to disclose confidential information," and,

---

[125] *Id.*

[126] Ex. E at 6.

[127] *Id.*

[128] *See generally* Ex. A at 1.

[129] Letter from Lawrence Berger, Esq., Mahon & Berger Esqs., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 2 (Sept. 29, 2023) (emphasis omitted) (attached as Ex. O); Email from Lawrence Berger, Esq., Mahon & Berger, Esqs., to Kiley Bidelman, Chief Clerk, H. Comm. on the Judiciary, et al. (Oct. 2, 2023, 9:43 AM) (attached as Ex. P at 1-2).

[130] *See* Ex. O at 2-4.

according to Chan's personal counsel, both he and Chan "may lack the expertise necessary to protect privileged information wholly on [their] own."[131]

90.     On October 3, 2023, Chairman Jordan wrote to Chan's personal counsel and, once more, explained the legal basis for the Committee's investigation and explained how the Subpoena furthers that investigation.[132]  Chairman Jordan emphasized that Chan, "[a]s the primary liaison between the [FBI Task Force] and social media companies," "is uniquely positioned to aid the Committee's oversight."[133]  Chairman Jordan also set forth the Committee's legal basis for not allowing agency counsel to attend Chan's deposition: the Constitution's Rulemaking Clause gives the House the authority to determine who may attend its depositions, and the House has done just that.[134]  Indeed, House Resolution 5—which was adopted by the full House this Congress—does not permit agency counsel to attend depositions.[135]  Nor do the Rules Committee's regulations governing House depositions, which the Committee itself adopted at the beginning of the 118th Congress.[136]

91.     Beyond setting out the legal basis for the House not permitting agency counsel to attend depositions, Chairman Jordan also explained the rationale behind the House's longstanding rule.  For example, Chairman Jordan pointed out that "agency counsel represents

---

[131] *Id.* at 3.

[132] *See* Ex. L at 1-2.

[133] *Id.* at 2; *see also id.* (noting that internal Twitter communications, made public as part of the Twitter Files, "further revealed and confirmed Mr. Chan's role in the government's online censorship efforts").

[134] *See id.* at 5-6.

[135] *Id.* at 6 (citing H. Res. 5, 118th Cong. § 3(k)(3) (2023)).

[136] *Id.* (citing Judiciary Committee Rule XI).

the *agency*'s interests," not the witness's personal interests, and thus "may pressure the witness explicitly or implicitly to not disclose certain information relevant to the Committee's investigation."[137]   Agency counsel may "create conflicts for the witness and impede the Committee's oversight," Chairman Jordan noted, "especially … where, as here, the witness's individual interests and the agency's institutional interests diverge."[138]   Finally, Chairman Jordan noted that the Committee has uncovered evidence, as part of its investigation, that it believes "appears to contradict several statements that Mr. Chan made" during his deposition in the *Missouri v. Biden* litigation.[139]   Because Chan was represented by agency counsel there, Chairman Jordan explained, "it is reasonable for the Committee to believe that Mr. Chan will be more veracious outside the presence of agency counsel."[140]

92.     The House's decision not to allow agency counsel to attend depositions is a legitimate exercise of its constitutional authority to adopt its own rules and procedures.[141]   But the Committee nonetheless offered "an extraordinary accommodation" to allow the Executive Branch to protect its purported interests and avoid the need for the Committee to initiate litigation: it offered "to allow agency counsel to remain physically present just outside the Committee room in which the interview will occur and will permit [Chan and his personal counsel] a recess at any time to consult with agency counsel about any matters that may arise

---

[137] *Id.*

[138] *Id.* at 7.

[139] *Id.*

[140] *Id.*

[141] *See id.* at 5-6.

during the deposition."[142]  In the Committee's view, this accommodation would allow Chan and his personal counsel "to consult with agency counsel as necessary and alleviate[] the concerns [Chan's personal counsel] ha[d] articulated about proceeding without agency counsel."[143]

93.     Later on October 3, 2023, DOJ wrote to Chairman Jordan and again argued that the Subpoena is unenforceable because agency counsel would not be permitted to attend the deposition.[144]  DOJ rejected the Committee's proposed accommodation to allow agency counsel to remain physically present just outside the room where the deposition would occur and permit Chan to recess the deposition at any time to consult with agency counsel because, in DOJ's view, "it would not adequately ensure that the agency could make the necessary decisions to protect privileged information during the course of the deposition."[145]  DOJ also said that it believed the accommodation "would prevent the Executive Branch from ensuring that the testimony provided was accurate, complete, and properly limited in scope."[146]  DOJ explained that it would only "make Mr. Chan available for a voluntary transcribed interview, accompanied by agency and personal counsel."[147]

94.     The next day, on October 4, 2023, Chairman Jordan wrote to DOJ and, as he had done for Chan's personal counsel, explained the Committee's legal basis for not permitting

---

[142] *Id.* at 8.

[143] *Id.*

[144] Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 1 (Oct. 3, 2023) (attached as Ex. Q).

[145] *Id.* at 2 n.4 (citation omitted).

[146] *Id.* (citation omitted).

[147] *Id.* at 1.

agency counsel to attend depositions.[148]  He also emphasized that "[t]he Executive Branch cannot dictate how Congress will carry out its core congressional functions,"[149] which is precisely what it was trying to do here by refusing to abide by the House rule that does not permit agency counsel to attend depositions.

95.    Beyond explaining the legal basis for the House's deposition rule and emphasizing the separation-of-powers concerns that DOJ's position raised, Chairman Jordan also addressed DOJ's concerns about purported privileged information.  "Mr. Chan's personal counsel is an experienced litigator who has represented numerous federal law enforcement officers in matters before Congress," Chairman Jordan explained, and "Mr. Chan is a senior national security official who currently holds a security clearance and accordingly has a personal obligation at all times not to disclose classified information."[150]  For these reasons, "the Committee is confident that Mr. Chan's counsel can effectively advise his client as to the issues [DOJ] identified."[151]

96.    Turning to DOJ's willingness to engage in the accommodation process, Chairman Jordan highlighted that DOJ had not offered an accommodation that it and other Executive Branch agencies have previously offered in situations like this one.  He explained that when Congress interviews or deposes a government employee without agency counsel, the Executive Branch "agency typically issues a letter of authorization to the witness's personal counsel

---

[148] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick B. Garland, Att'y Gen., DOJ, at 2-3 (Oct. 4, 2023) (attached as Ex. R).

[149] *See id.* at 4.

[150] *Id.* at 3.

[151] *Id.*

detailing the scope of the authorized testimony and advising the personal counsel as to any matters of potential privilege."[152]  Here, however, the Executive Branch had not offered any such letter and had not explained why such a letter could not be provided.[153]

97.    Later on October 4, 2023, Chan's personal counsel notified Committee staff that he had "received a letter from [DOJ] informing [him] that … Chan is directed not to appear before the Committee, tomorrow, October 5, for a deposition, without [Chan's] firm choice of counsel, which includes agency counsel."[154]  The email explained that Chan would not appear for the October 5, 2023 deposition "if the Committee continues to insist that agency counsel be precluded from attending the deposition."[155]

98.    On October 5, 2023, Chan did not appear for his deposition.  Committee staff opened the record, introduced exhibits, and then closed the record.[156]

99.    Chan thus violated his legal duty to comply with the Committee's lawfully issued Subpoena, and his defiance is obstructing the Committee's investigation.

100.    DOJ's position that the Subpoena is unenforceable because it does not permit agency counsel to attend has no merit.  The Constitution empowers the House to adopt its own rules.  It has had a version of this deposition rule for decades, and numerous Executive Branch employees have testified in Congressional depositions without agency counsel present.

---

[152] *Id.*

[153] *See id.* at 3-4.

[154] Email from Lawrence Berger, Esq., Mahon & Berger, Esqs., to Kiley Bidelman, Chief Clerk, H. Comm. on the Judiciary, et al. (Oct. 4, 2023, 7:35 PM) (attached as Ex. P at 1).

[155] *Id.*

[156] *See generally* Transcript of Elvis Chan, Assistant Special Agent in Charge, S.F. Field Off., FBI (Oct. 5, 2023) (attached as Ex. S).

101.    Pursuant to House Rule II.8(b), BLAG voted to authorize the Judiciary

Committee to initiate this litigation.[157]  This House Leadership group "speaks for, and articulates

the institutional position of, the House in all litigation matters."[158]

### III.    The House has delegated deposition authority to committees for over thirty years, and the relevant rules have never allowed agency counsel to attend depositions

102.    The Constitution grants the House the authority to adopt its own rules and

procedures.[159]  Promulgating a rule that dictates who may and may not attend depositions is a

valid exercise of that authority.

#### A.    Decades ago, the House began delegating deposition authority to committees charged with investigating a discrete subject, and the relevant rules did not allow agency counsel to attend depositions

103.    In the 1980s and 1990s, the House delegated the authority to conduct depositions

to the Select Committee to Investigate Covert Arms Transactions with Iran and to the Task Force

of Members of the Foreign Affairs Committee to Investigate Certain Allegations Concerning the

Holding of Americans as Hostages by Iran in 1980.[160]

---

[157] BLAG is comprised of the Honorable Mike Johnson, Speaker of the House, the Honorable Steve Scalise, Majority Leader, the Honorable Tom Emmer, Majority Whip, the Honorable Hakeem Jeffries, Minority Leader, and the Honorable Katherine Clark, Minority Whip.  *See* House Rule II.8(b).  The Speaker of the House, the Majority Leader, and the Majority Whip voted to authorize this litigation; the Minority Leader and Minority Whip did not.

[158] House Rule II.8(b).

[159] U.S. Const. art. 1, § 5, cl. 2.

[160] *See, e.g.*, H. Res. 12, 100th Cong. §§ 1, 6 (1987) (attached as Ex. T); H. Res. 258, 102d Cong. §§ 1, 6 (1991) (attached as Ex. U).

104.    In providing this authority, the House permitted the select committee and the task force to adopt rules regulating depositions, including regulations regarding who could attend.[161]

105.    In turn, the select committee and task force adopted rules that allowed personal counsel to accompany witnesses to advise them of their rights but did not allow agency counsel to attend.[162]

106.    The rules alleviated the concern that the presence of agency counsel could hinder investigations by pressuring a witness not to disclose information relevant to a committee's investigation, particularly when an investigation involved issues of agency corruption or abuse or when the witness's interests diverged from the agency's interests.

---

[161] *See, e.g.*, Ex. T, H. Res. 12, § 2 (authorizing the select committee to adopt rules that "may govern the conduct of the depositions, … including the persons present"); Ex. U, H. Res. 258, § 2 (same).

[162] *See, e.g.*, Rule 7.3, Rules of the Select Committee to Investigate Covert Arms Transactions with Iran of the U.S. House of Representatives, 100th Cong. (Comm. Print 1987) ("Witnesses may be accompanied at a deposition by personal counsel to advise them of their rights …; observers or *counsel for other persons or for the agencies under investigation may not attend*."  (emphasis added)) (attached as Ex. V); Rule 7.3, Rules of the Task Force to Investigate Certain Allegations Concerning the Holding of American Hostages by Iran in 1990 of the U.S. House of Representatives, 102d Cong. (Comm. Print 1992) ("Witnesses may be accompanied at a deposition by counsel representing the witness to advise them of their rights …; observers or *counsel for other persons or for agencies may not attend*."  (emphasis added)) (attached as Ex. W).

Years later, in 2014, the House established the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi and delegated it deposition authority, subject to regulations issued by the Rules Committee, *see* H. Res. 567, 113th Cong. §§ 1, 4(c)(4)-(5) (2014), https://perma.cc/ZB5U-Z4F7, and the Rules Committee issued regulations that said "[n]o one may be present at depositions except … the witness[] and the witness's counsel.  Observers or *counsel for other persons, or for agencies under investigation, may not attend*."  160 Cong. Rec. H4056 (daily ed. May 9, 2014) (emphasis added), https://perma.cc/5Y5G-27GW.

**B.      The House delegated deposition authority to the Oversight Committee, and the Oversight Committee continued the tradition of not allowing agency counsel to attend**

107.    Beginning in 2007, the House delegated deposition authority to the House Committee on Oversight and Accountability (Oversight Committee) and gave it the authority to adopt its own rules "authorizing and regulating" depositions.[163]

108.    Under this authority, the Oversight Committee adopted a rule not allowing "[o]bservers or counsel for other persons, or for agencies under investigation," to attend depositions.[164]

109.    Since 2007, the House, under both Democratic and Republican leadership, has continued to delegate general deposition authority to the Oversight Committee each Congress, including this one, the 118th Congress.[165]

110.    The Oversight Committee in each Congress has continued to adopt a rule that does not permit agency counsel to attend depositions.[166]

---

[163] H. Res. 6, 110th Cong. § 502 (2007), https://perma.cc/6PJ6-8TD3; House Rule X.4(c)(3)(A), 110th Cong. (2007), https://perma.cc/V4GZ-FDVH.

[164] *See* Rule 22, Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 110th Cong. (2007), https://perma.cc/FA5E-NJH8.

[165] *See* House Rule X.4(c)(3)(A), 111th Cong. (2009), https://perma.cc/L2NY-7975; House Rule X.4(c)(3)(A), 112th Cong. (2011) (attached as Ex. X); House Rule X.4(c)(3)(A), 113th Cong. (2013) (attached as Ex. Y); House Rule X.4(c)(3)(A), 114th Cong. (2015), https://perma.cc/939M-WJMW; House Rule X.4(c)(3)(A), 115th Cong. (2017) (attached as Ex. Z); House Rule X.4(c)(3)(A), 116th Cong. (2019), https://perma.cc/N76S-TM98; House Rule X.4(c)(3)(A), 117th Cong. (2021), https://perma.cc/HH35-VJKY; House Rule X.4(c)(3)(A), 118th Cong. (2023).

[166] *See* Rule 22, Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 111th Cong. (Comm. Print 2009) ("Observers or counsel for other persons, or for agencies under investigation, may not attend."), https://perma.cc/5JVT-S8JT; Rule 15(d), Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 112th Cong. (2011) (same), https://perma.cc/3F3E-5XQW; Rule 15(d), Rules of

### C.     Next, the House delegated deposition authority to more standing committees, including the Judiciary Committee, and the governing regulations and rules still did not allow agency counsel to attend

111.     In 2015, the House provided deposition authority to four more committees: the Committees on Energy and Commerce; Financial Services; Science, Space, and Technology; and Ways and Means.[167]  The authorizing resolution that delegated this authority said that depositions "shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record."[168]

112.     The Rules Committee then issued Regulations for the Use of Deposition Authority (Deposition Regulations) stating that "[o]bservers or counsel for other persons, or for agencies under investigation, may not attend" depositions.[169]

---

the Committee on Oversight & Government Reform of the U.S. House of Representatives, 113th Cong. (2013) (same), https://perma.cc/WD3D-26VE; Rule 15(d), Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 114th Cong. (2015) (same), https://perma.cc/BX67-292H; Rule 15(e), Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 115th Cong. (2017) (same), https://perma.cc/5VLJ-4FYC; Rule 15(e), Rules of the Committee on Oversight & Reform of the U.S. House of Representatives, 116th Cong. (2019) (same), https://perma.cc/2U7N-UXTQ; Rule 15(e), Rules of the Committee on Oversight & Reform of the U.S. House of Representatives, 117th Cong. (2021) (same), https://perma.cc/CHD7-NTJ9; Rule 15(e), Rules of the Committee on Oversight & Accountability of the U.S. House of Representatives, 118th Cong. (2023) ("No one may be present at depositions except members, Committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's two designated attorneys.  Other persons, including government agency personnel, may not attend."), https://perma.cc/3PRQ-GDJW.

[167] H. Res. 5, 114th Cong. § 3(b) (2015), https://perma.cc/G85G-QPG9.

[168] *Id.* § 3(b)(2).

[169] 161 Cong. Rec. E21 (daily ed. Jan. 7, 2015), https://perma.cc/UF2U-DQ94.

113. In 2017, the House delegated deposition authority to all standing committees, except for the Committee on House Administration and the Rules Committee.[170] The House has continued to delegate general deposition authority (subject to the Deposition Regulations) to these committees and the Committee on House Administration, under Democratic and Republican leadership, each Congress since 2017, including this one (the 118th Congress).[171]

114. During each Congress from 2017 to 2023, the Deposition Regulations adopted by the Rules Committee have not permitted government agency counsel to attend depositions.[172]

### D. In the current Congress, the full House adopted a provision as part of its rules package that does not permit agency counsel to attend depositions

115. In the 118th Congress, rather than relying solely on the Rules Committee's Deposition Regulations, the full House adopted language as part of its rules package that expressly prevents agency counsel from attending depositions.[173]

116. Additionally, in the 118th Congress, the Rules Committee again promulgated Deposition Regulations that do not allow agency counsel to attend depositions.[174] The Judiciary

---

[170] H. Res. 5, 115th Cong. § 3(b) (2017), https://perma.cc/45K6-PTF3.

[171] H. Res. 6, 116th Cong. § 103(a) (2019), https://perma.cc/V5X8-GQ5C; H. Res. 8, 117th Cong. § 3(b) (2021), https://perma.cc/HU3Y-TDMS; H. Res. 5, 118th Cong. § 3(k)(1)-(2) (2023).

[172] 163 Cong. Rec. H536 (daily ed. Jan. 13, 2017), https://perma.cc/52VG-3MMB; 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019), https://perma.cc/VJ8J-N9TN; 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021), https://perma.cc/4VVX-N7J3; 169 Cong. Rec. H147.

[173] H. Res. 5, 118th Cong. § 3(k)(3) (2023) ("Deponents may be accompanied at a deposition by two designated personal, nongovernmental attorneys to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's two designated attorneys are permitted to attend. Other persons, including government agency personnel, may not attend.").

[174] 169 Cong. Rec. H147.

Committee's Rules also specifically note that the Deposition Regulations govern its depositions.[175]

117.    Thus, in the 118th Congress, language adopted by the full House, the Rules Committee's Deposition Regulations, and the Judiciary Committee's Rules all make clear that the longstanding rule continues to apply, and agency counsel are not permitted to attend depositions.

### E.    The House, under both Democratic and Republican control, has concluded that the presence of agency counsel in depositions could interfere with investigations

118.    Under both Democratic and Republican leadership, the House has concluded that agency counsel's presence in depositions could interfere with investigations, especially when the investigation involves issues of agency corruption or abuse.[176]

119.    A committee's right to exclude agency counsel is especially important when a witness's personal interests depart from the interests of the agency employing the witness.  A witness may be less willing to divulge information that reflects poorly on his employing agency if the agency's lawyer is in the room.

120.    Here, this interest is not abstract, either.  The Committee has uncovered information through its investigation that, in its view, "appears to contradict several statements that Mr. Chan made" during his deposition in *Missouri v. Biden*, where Chan was represented by

---

[175] Judiciary Committee Rule XI (2023).

[176] *See, e.g.*, H. Rep. No. 116-125, at 33 (2019) (report from the Oversight Committee, which was under Democratic control), https://perma.cc/2NQH-KUXP; Oversight Comm. Democrats, *Committee Depositions in the House of Representatives: Longstanding Republican and Democratic Practice of Excluding Agency Counsel* 4-5 (last visited Feb. 2, 2024), https://perma.cc/3ZS3-4EEX (*Longstanding Practice*).

agency counsel.[177]  The Committee thus believes that Chan may "be more veracious outside the presence of agency counsel."[178]

121.    Beyond protecting the integrity of investigations, excluding agency counsel also helps protect witnesses from the possibility of threats, abuse, or coercion from their employers.[179]

122.    The House rule thus aims to protect agency witnesses who may share information that is damaging to their employing agency just as federal law aims to protect whistleblowers who disclose information that could reflect poorly on their employing agency.[180]

**F.    House committees have deposed at least 176 Executive Branch employees without agency counsel**

123.    More than 175 Executive Branch witnesses have appeared for depositions—under both Democratic and Republican control of the House—without agency counsel present.[181]

124.    Indeed, despite DOJ's current position, the OLC opinion on which it relies was not published until 2019—decades after Congress's practice of excluding agency counsel began.

---

[177] Ex. R at 3.

[178] *Id.*

[179] *See* H. Rep. No. 116-125, at 33; *Longstanding Practice*, *supra* note 176, at 1; Morton Rosenberg, *When Congress Comes Calling: A Study on the Principles, Practices, and Pragmatics of Legislative Inquiry* 38 (2017), https://perma.cc/HM9G-87E9.

[180] *Cf.* 5 U.S.C. § 2302(b)(8)(C) ("Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority … take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of … any disclosure to Congress (including any committee of Congress) ….").

[181] *See generally Longstanding Practice*, *supra* note 176.

125.    As Chairman Jordan explained to the FBI here, agencies typically issue an authorization letter to the witness's personal counsel that sets out the scope of the authorized testimony and advises on matters that may be privileged.[182]  However, neither DOJ nor the FBI has explained why it has not followed that approach here.[183]

## SPECIFIC CLAIM FOR RELIEF

## COUNT I

126.    The Judiciary Committee incorporates by reference and realleges the preceding paragraphs, as if set forth fully here.

127.    The Subpoena was duly authorized, issued, and served pursuant to the Judiciary Committee's powers under Article I of the Constitution of the United States.

128.    The Subpoena required Chan to appear to testify at a deposition before the House Judiciary Committee on October 5, 2023, yet Chan did not appear as required.

129.    The Judiciary Committee has attempted to make reasonable accommodations for Chan's testimony, but those efforts are at an impasse, and Chan continues to refuse to appear for his deposition.

130.    There is no lawful basis for Chan's refusal to appear before the Judiciary Committee for his deposition.

131.    Chan has violated and continues to violate his legal obligations by refusing to appear before the Judiciary Committee as required by the Subpoena, and by refusing to answer questions when there has been no assertion of privilege by the Executive Branch.

---

[182] Ex. R at 3.

[183] *Id.* at 3-4.

132.    As a result, the Judiciary Committee has been, and will continue to be, injured by Chan's actions.

## PRAYER FOR RELIEF

WHEREFORE, the Judiciary Committee respectfully prays that this Court:

A.    Pursuant to 28 U.S.C. §§ 2201(a) and 2202, enter declaratory and injunctive relief as follows:

1.    Declare that Chan's refusal to appear before the Committee in response to the Subpoena lacks legal justification; and

2.    Issue an injunction ordering Chan to appear and testify immediately before the Committee.

B.    Retain jurisdiction to review any disputes that may arise over compliance with the Court's order.

C.    Grant the Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Deputy General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
   *Associate General Counsel*
Rachel A. Jankowski (D.C. Bar No. 1686346)
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL[184]
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC 20515
Telephone: (202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

February 6, 2024

---

[184] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571(a).